# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CAROLYN LUKE TEWS,

     Plaintiff,

v.                                                    Case No. 3:20-cv-810-MMH-JBT

T. L. TERRELL, individually,

     Defendant.

_____

# O R D E R

**THIS CAUSE** is before the Court on Defendant T. L. Terrell's Motion for

Summary Judgment and Accompanying Memorandum of Law (Doc. 26; Motion)

filed on May 6, 2022.   In support of the Motion, Terrell submitted a number of

items.   <u>See</u> Defendant's Notice of Filing Documents in Support of Motion for

Summary Judgment (Doc. 27; Defendant's Notice of Filing).   First, he filed his

own Declaration.   Declaration of T. L. Terrell (Doc. 27-1; Terrell Declaration).

Terrell also submitted a video of Plaintiff Tews' arrest (Doc. 27-2; Arrest Video),

and the Field Sobriety Report from the arrest (Doc. 27-3) as well as the Sheriff's

Handcuff Transport (Doc. 27-4) and Response to Resistance Policies for 2016

(Doc. 27-5).   <u>See</u> <u>id.</u>   Additionally, Terrell filed the Declaration of David A.

Klinger, Ph.D. (Doc. 27-6), including Dr. Klinger's Curriculum Vitae (Doc. 27-7)

and Expert Report (Doc. 27-8), and the Deposition Transcript of Carolyn Luke

Tews with Exhibits (Doc. 27-9) with the corresponding deposition video (Doc. 27-10; Depo. Video).   Plaintiff Carolyn Luke Tews filed her corrected Response in Opposition (Doc. 35; Response) to the Motion on June 10, 2022.   In support, Tews submitted her Deposition Transcript (Doc. 36-1; Depo. Transcript),[1] along with her Arrest Report and her Response to Defendant's First Set of Interrogatories (Interrogatory Answers).   See Notice of Filing Deposition Transcript in Response to Motion for Summary Judgment (Doc. 36; Plaintiff's Notice of Filing).   Accordingly, Terrell's Motion is ripe for the Court's consideration.

## I.   Procedural History

On February 7, 2020, Tews initiated this lawsuit by filing a complaint against Terrell in the Fourth Judicial Circuit Court in and for Duval County, Florida.   See Complaint and Demand for Jury Trial at 1 (Doc. 2; Complaint). Terrell removed the action to this Court based on federal question jurisdiction. See Notice of Removal at 1–2 (Doc. 1).   In her Complaint, Tews asserts a claim of excessive force in violation of her Fourth and Fourteenth Amendment rights (Count I) along with a state-law battery claim (Count II).   See Complaint at 4–5.   Terrell filed a Motion to Dismiss Plaintiff's Complaint (Doc. 3; Motion to

---

[1]      Both Plaintiff and Defendant have attached versions of the same transcript, but with different pagination.   Compare Deposition Transcript of Carolyn Luke Tews with Exhibits, with Depo. Transcript.   For ease of reference, the Court will refer to the page numbers in the transcript filed at docket number 36-1 in resolving the instant Motion.

Dismiss) on July 22, 2020.   On September 30, 2020, the Court granted the Motion to Dismiss in part and denied it in part.   See Order (Doc. 22; Order on Motion to Dismiss).   Specifically, the Court dismissed the state-law battery claim, but found that Tews plausibly alleged a claim for excessive force.   Id. at 15.   Accordingly, Count I is the only claim remaining for consideration by the Court.   Terrell now seeks the entry of judgment as a matter of law on this remaining claim, and Tews has responded in opposition.

## II.   Background Facts[2]

On February 8, 2016, Tews visited a pool hall from approximately 7:00 P.M. to midnight.   Depo. Transcript at 31.   While playing pool, she drank about two pints of beer.   Id. at 62.   After finishing her pool match, Tews left the pool hall and began to drive home.   Id. at 29.   During the drive, Tews' phone fell off her seat.   Id.   She swerved while trying to retrieve it, attracting Officer Terrell's attention.   Id. at 29–30.   Concerned that Tews might be impaired or suffering from a medical emergency, Terrell pulled her over shortly after midnight on the morning of February 9.   Terrell Declaration at 3; Arrest Report at 1.   After pulling over, Tews explained to Terrell that she swerved while retrieving her phone.   Depo. Transcript at 33.   She admitted to drinking

---

[2]        Unless otherwise noted, the facts recited herein are undisputed.   For the purpose of summary judgment, the Court views all disputed facts and reasonable inferences in the light most favorable to Tews.   See Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (describing the summary judgment standard).

two pints of beer while playing pool, but told Terrell that she felt fine.  Id. at 29.  Terrell asked if Tews would ride with him to a nearby shopping center and take a sobriety test.  Id. at 30.  Tews agreed.  Id.

Though she found the cold weather challenging, Tews followed Terrell's instructions and completed the Field Sobriety Exercises (FSEs).  Id. at 37–38; Terrell Declaration at 4.  In evaluating her performance, Terrell concluded that Tews was impaired.  Id. at 4–5.  He placed her under arrest, handcuffed her arms behind her back, and secured her in the back seat of his patrol car. Id.; Depo. Transcript at 39.  Suffering from an old shoulder injury, Tews struggled to find a comfortable position for her left arm.  Depo. Transcript at 39–40.  In the process, Tews, who was 5'1" and weighed approximately one hundred pounds, slipped her left hand out of the handcuffs.  Id.; Terrell Declaration at 5; see also Response at 3 (describing Tews' height and weight).

Noticing that Tews' left hand was free, Terrell told her that she had to keep the handcuffs on.  Depo. Transcript at 41; Arrest Video at 00:59:51.[3] Worried about her shoulder, Depo. Transcript at 47, Tews responded "no," and "this is ridiculous, I'm 60."  Arrest Video at 00:59:48.  Terrell exited the car, opened the rear passenger-side door,[4] and repeated that Tews had to keep the

---

[3]    The video is overlaid with an internal time stamp.  For ease of reference, the Court will use this time stamp to reference specific points in the video.

[4]    The rear-facing camera in the patrol car captures a reversed image.  Terrell Declaration at 2.  While Tews appears to be sitting behind the driver's seat with a handcuff dangling from her left wrist, this is a mirror image of the actual events.

handcuffs on.   Id. at 00:59:55.   Terrell asked Tews to step out of the vehicle, adding that it was the Sheriff's Office policy for everybody in the back seat to be handcuffed.   Id. at 1:00:06.   After some hesitation, Tews complied.   Id. at 01:00:10; Terrell Declaration at 5.   As she was exiting the car, Tews remarked, "this is the determining factor of the rest of my life, what you're doing now." Arrest Video at 01:00:12.

Tews has trouble remembering exactly what happened next.   See Depo. Transcript at 47, 51.   The Arrest Video does not show a clear view of anything outside the back seat.   See Order on Motion to Dismiss at 4 (Doc. 22). However, Tews can be heard responding to Terrell's commands by saying "no, no, no," followed by "I'm going to force you to kill me right now."   Arrest Video 01:00:26.   Terrell then ordered Tews to put her hands behind her back, to which Tews responded, "no."   Id. at 01:00:34.   Terrell then said, "Ms. Carolyn, do not do this."   Id. at 01:00:37.   Tews asked Terrell to repeat his name, and then stated, "I want you to go ahead and kill me.   I want you to go ahead and kill me right now, Terrell."   Id. at 01:00:42.   The video then shows Tews sitting back down inside the police cruiser before being pulled back out by Terrell.   Id. at 01:00:48; Terrell Declaration at 6 ("After a few seconds, Tews tries to get in the backseat . . . and I pull her out again."); Depo. Transcript at 47 ("And then he pulled and pulled to the point where he got me out and that's when I don't remember anything else.").   As Terrell pulled her, Tews said, "go ahead and

dislocate my shoulder." Arrest Video at 01:00:50. Outside the car, Terrell again commanded Tews to put her hands behind her back. Id. at 01:00:51. Terrell can then be heard saying "stop resisting," to which Tews responded, "I'm not resisting." Id. at 01:00:56.

It is undisputed that Tews was trying to pull her arm away from Terrell throughout this exchange. See Terrell Declaration at 6; Depo. Transcript at 68. Terrell repeated "stop resisting" four more times, each followed by Tews' denial that she was resisting. Arrest Video at 01:00:58; Terrell Declaration at 6. Terrell again commanded Tews to put her hands behind her back. Arrest Video at 01:01:08. Tews responded, "I'm not resisting. I don't have any weapons. I don't have anything." Id. at 01:01:10.

Throughout this process, Terrell was increasingly concerned by Tews' "escalating combativeness and agitation," and feared that the dangling handcuff could be used as a weapon. Terrell Declaration at 6–7. Terrell was also alarmed by Tews' seemingly suicidal statements along with the change in her demeanor "from compliant to combative." Id. at 6. Because Terrell could not use his taser without releasing Tews, he decided to use "the straight-arm bar take-down technique to overcome Tews' resistance." Id. at 7. This technique involves grabbing the subject's wrist and bicep, and rotating to the side while pulling backwards to force the subject into a prone position. Id. at 8. The arm-bar takedown is not visible in the video, but Terrell can be heard

giving a final command for Tews to put her hands behind her back. Arrest Video at 01:01:13.  Tews begins to respond, but is cut short by the sound of a struggle, followed by the sound of handcuffs being applied.  <u>Id.</u>; <u>see also</u> Terrell Declaration at 7 ("While on the ground, I was then able to grab both of her hands and handcuff them.").

Tews was thrown to the "hard asphalt" during the struggle, where she landed on her face and was knocked unconscious.  <u>See</u> Terrell Declaration 7 (describing the "hard asphalt" and Terrell's use of "the straight-arm bar take-down technique"); Depo. Transcript at 47, 52.  One of Tews' teeth was knocked out on the pavement, and two others were fractured.  <u>See</u> Depo. Transcript at 53; Terrell Declaration at 7.  Tews also suffered contusions, lacerations, nerve damage, and a concussion.  Depo. Transcript at 54–58.  Paramedics took Tews to the hospital, and she was taken to jail upon her release the following day. <u>Id.</u> at 71.  Her shoulder pain became more extreme, limiting her ability to work as a massage therapist and causing her to lose clients.  <u>Id.</u> at 92–94.

Tews was charged with DUI and resisting an officer without violence, but the DUI charge was eventually reduced to reckless driving.  <u>See id.</u> at 73; Terrell Declaration at 9.  Tews does not dispute that Terrell had probable cause for the traffic stop.  <u>See</u> Depo. Transcript at 74.  The parties also agree that Terrell used no other force after taking Tews to the ground and applying the handcuffs.  <u>See</u> Depo. Transcript at 70; Terrell Declaration at 7.

## III.   Legal Standard

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Rule 56(a).   The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."   Rule 56(c)(1)(A).[5]   An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.   See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).   "[A]

---

[5]      Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.   "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."   Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

In citing to Campbell, the Court notes that "[a]lthough an unpublished opinion is not binding . . . , it is persuasive authority."   United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; see also McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case."). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing

summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## IV.   Discussion

In Count I, Tews asserts that Terrell used unconstitutionally excessive force when he threw her to the ground in the early morning hours of February 9, 2016.   Complaint at 4.   Terrell seeks summary judgment, asserting both that the force was constitutional as a matter of law, and that he is entitled to qualified immunity.   Motion at 2.

The doctrine of "[q]ualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). As a result, this defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'"[6] <u>Mullenix v. Luna</u>, 577 U.S. 7, 12 (2015) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)); <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1266 (11th Cir. 2003).   Indeed, as "'government officials are not required

---

[6]      In determining whether a defendant is entitled to qualified immunity, courts view the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record, and then consider "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law." <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 925 n.3 (11th Cir. 2000); <u>Scott v. Harris</u>, 550 U.S. 372, 381 n.8 (2007).

to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler Cnty., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, a defendant bears the initial burden of showing that his conduct was within the scope of his discretionary authority. See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007); Lee, 284 F.3d at 1194. Here, it is undisputed that, at all times material to this case, Officer Terrell was acting in his official capacity and within the scope of his discretionary authority.[7]  Accordingly, the burden shifts to Tews to demonstrate that qualified immunity is not appropriate using the test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001).

In accordance with Saucier, the Court must ask whether the facts viewed in the light most favorable to the plaintiff "show the officer's conduct violated a constitutional right." Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting Scott v.

---

[7]     "'A government official acts within [his] discretionary authority if the actions were (1) undertaken pursuant to the performance of [his] duties and (2) within the scope of [his] authority.'" Jones v. City of Atlanta, 192 F. App'x 894, 897 (11th Cir. 2006) (per curiam) (quoting Lenz v. Winburn, 51 F.3d 1540, 1545 (11th Cir. 1995)). Making an arrest is thus a discretionary function for a police officer. See Crosby v. Monroe Cnty., 394 F.3d 1328, 1332 (11th Cir. 2004); see also Lee, 284 F.3d at 1194 (finding that "there can be no doubt that [the officer] was acting in [her] discretionary capacity when [s]he arrested [the plaintiff]," even though the plaintiff asserted that the officer used excessive force in the manner in which she was arrested).

<u>Harris</u>, 550 U.S. 372, 377 (2007)).   The court must also ask whether the right allegedly violated was clearly established at the time of the violation.   <u>Hope</u>, 536 U.S. at 739; <u>Saucier</u>, 533 U.S. at 201; <u>Scott</u>, 550 U.S. at 377; <u>Underwood v. City of Bessemer</u>, 11 F.4th 1317, 1328 (11th Cir. 2021) ("we ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct") (internal quotations omitted).   The Court may consider these questions in whichever order it chooses, and qualified immunity will protect the defendant if the answer to either question is "no."   <u>Pearson v. Callahan</u>, 555 U.S. 223, 232, 236 (2009)[8]; <u>Underwood</u>, 11 F.4th at 1328.

## A. Excessive Force

Addressing the first question, the Court must determine whether Terrell subjected Tews to an unlawful use of force during the arrest.   Specifically, the Court must evaluate whether Terrell applied excessive force when he used the arm-bar takedown.   In conducting this analysis, the Court heeds the Supreme Court's cautions that:

> [d]etermining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature

---

[8]     In <u>Pearson</u>, the Supreme Court modified the procedure mandated in <u>Saucier</u>, permitting courts the discretion to determine which prong of the qualified immunity analysis should be resolved first. See <u>Pearson</u>, 555 U.S. at 236.

and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [she] is actively resisting arrest or attempting to evade arrest by flight.

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies:  Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.

Graham v. Connor, 490 U.S. 386, 396–97 (1989) (internal citations and quotations omitted).  See also Croom v. Balkwill, 645 F.3d 1240, 1251–52 (11th Cir. 2011);  Draper v. Reynolds, 369 F.3d 1270, 1277–78 (11th Cir. 2004); Durruthy v. Pastor, 351 F.3d 1080, 1093–94 (11th Cir. 2003).  Consistent with this authority, a court uses the (1) severity of the crime, (2) danger to officer

safety, and (3) risk of flight, referred to as the <u>Graham</u> factors, to analyze the reasonableness of an officer's use of force. <u>See</u> <u>Lee</u>, 284 F.3d at 1198.   Indeed, "<u>Graham</u> dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight."   <u>Id.</u>; <u>see also</u> <u>Taylor v. Taylor</u>, 649 F. App'x 737, 746 (11th Cir. 2016).   In addition to the <u>Graham</u> factors, the Eleventh Circuit has also set forth the following considerations for determining if force was reasonable: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1347 (11th Cir. 2002) (citing <u>Lee</u>, 284 F.3d at 1197-98). Significantly, "an officer will be entitled to qualified immunity . . . if an objectively reasonable officer in the same situation could have believed that the force used was not excessive."   <u>Vinyard</u>, 311 F.3d at 1346.

The Court first notes that Terrell was justified in using some amount of force in reapplying the handcuff to effectuate Tews' arrest.   <u>See</u> <u>Brown v. City of Huntsville</u>, 608 F.3d 738, 739–40 (11th Cir. 2010) ("[T]he law permits some use of force in any arrest.").   Indeed, a "law enforcement officer's right to arrest necessarily carries with it the ability to use some force in making the arrest." <u>Id.</u> at 740.   Even when a suspect is not actively resisting arrest or attempting

to flee, the police may use a "reasonable amount of force to subdue and secure" the suspect." <u>Lee</u>, 284 F.3d at 1198.   Moreover, even for "minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls." <u>Brown</u>, 608 F.3d at 740.

Here, the first <u>Graham</u> factor—the severity of the crime at issue—supports Terrell's use of force to effectuate Tews' arrest.   <u>See</u> <u>Cooper v. Brown</u>, 844 F.3d 517, 522 (5th Cir. 2016) (noting that this factor favored an officer during a DUI arrest, even where other factors did not, because "DUI is a serious offense").   The second <u>Graham</u> factor—the danger to officers or others—also supports Terrell's use of force.   490 U.S. at 396.   Tews argues that she "did not pose any threat" because she had been searched and was in the back of Terrell's patrol car.   Response 3–4.   But when Terrell used the arm-bar takedown, Tews was no longer inside the car and had removed one arm from the handcuffs applied by Terrell.   <u>See</u> Terrell Declaration at 6 (describing how, prior to the arm-bar takedown, he "placed [Tews] at the rear passenger quarter-panel of my patrol car").   And while Tews was smaller than Terrell, and was not armed or committing a violent crime, <u>see</u> Response at 3, she does not dispute Terrell's statement that he feared that the unsecured handcuff could be used as a weapon.   <u>Id.</u> at 7.   Nor does she dispute Terrell's belief that Tews was intoxicated, his observation of the change in Tews' mood, his assessment of her escalating statements of doom, and her refusal to comply with his instructions.

Certainly these facts could cause a reasonable officer to be concerned that leaving Tews with the unsecured handcuff presented a danger.   Even setting aside the risk to Terrell, Tews' suicidal statements[9] could reasonably have indicated that she was a risk to herself.   Coupled with Tews' repeated attempts to "pull away her free arm," Terrell Declaration at 6, Terrell could reasonably fear that Tews posed a risk to both of them.

The third <u>Graham</u> factor, "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," 490 U.S. at 396, also weighs in favor of Terrell's use of force.   <u>See</u> <u>Draper</u>, 369 F.3d at 1278 (officer's use of taser against plaintiff was reasonable where plaintiff was "hostile, belligerent, and uncooperative" with officer in the course of the arrest); <u>Hines v. Jefferson</u>, 338 F. Supp. 3d 1288, 1298 (N.D. Ga. 2018) (officer's use of chokehold was reasonable where plaintiff admitted to resisting and struggling against officer); <u>Crutcher v. Athens Police Dep't</u>, NO. CV-10-S-1176-NE, 2014 WL 5521944, at *6 (N.D. Ala. Oct. 31, 2014) (officer's use of chokehold that resulted in plaintiff losing consciousness was reasonable where plaintiff actively resisted arrest).[10]

---

[9]     In her Deposition, Tews explained that she felt "doomed" and "desperate," but not suicidal, when making the statements.   Depo. Transcript 46.   But her intended meaning does not change the result.   While the Court must view all facts in the light most favorable to Tews, <u>see</u> <u>Priester</u>, 208 F.3d at 925 n.3, qualified immunity hinges on how those facts could be perceived by "a reasonable officer on the scene."   <u>Graham</u>, 490 U.S. at 396.   And a reasonable officer could, as Terrell did, interpret her statement as suicidal.

[10]     The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority.   <u>See</u> <u>Stone v. First Union Corp.</u>, 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any

While Tews expresses her view that she was not resisting, Depo. Transcript at 42, she admits that she does not remember anything after she was pulled from the car.   See Depo. Transcript at 47.   Moreover, she does not dispute that she was refusing to allow Terrell to re-apply the handcuff.   Accordingly, Tews provides no evidence to dispute Terrell's assertion that Tews "continued to pull away her free arm" and "refused" to place her hands behind her back.   Terrell Declaration at 6.   And while Tews can be heard saying "I'm not resisting" on the video, Arrest Video at 01:00:56, this is consistent with Terrell's account, in which he stated, "Tews kept saying she was not resisting while her actions of pulling away and not allowing me to cuff her clearly demonstrated that she was not complying with my commands."   See Terrell Declaration at 6–7.

Notwithstanding Tews' comments about her memory, some of her statements suggest that—at least once she was outside the car—she pulled away out of reflex or pain rather than any intent to resist.   See Depo. Transcript at 42 ("I was not resisting.   I was wanting to not be hurt."); id. at 49 ("And I couldn't help but to not let him have this shoulder, this arm.").   But this would not change the analysis.   As previously discussed, the Court must analyze a reasonable officer's perception of Tews' behavior, not Tews' actual intent.   Graham, 490 U.S. at 396.   Because Tews does not dispute Terrell's

---

other district court's determination, the decision would have significant persuasive effects.").

description of her actions, this factor favors Terrell.   See Horn v. Barron, 720 F. App'x 557, 564–65 (11th Cir. 2018) (reasoning that an officer could reasonably "think [an arrestee] was resisting and posed a threat of resisting further" after she "pulled her arm away").

In a similar case where an individual refused to comply with an officer's instructions, the Eleventh Circuit held that the officer was entitled to qualified immunity for tasing even a restrained plaintiff who failed to comply with the officer's orders.   See Buckley v. Haddock, 292 F. App'x 791, 792 (11th Cir. 2008).[11]   In Buckley, the officer stopped the plaintiff for speeding, and the plaintiff began to sob and refused to sign his traffic citation.   Id.   The officer warned the plaintiff that if he refused to sign the ticket he would be arrested. Id.   The plaintiff insisted that the officer arrest him, and allowed the officer to handcuff him.   Id.   As the pair walked to the patrol car, the plaintiff dropped to the ground, crossed his legs, and continued to sob.   Id.   The plaintiff then stated, "My life would be better if I was dead."   Id.   The officer asked the plaintiff several times to stand up, attempted to lift him up, and warned him that he would use a taser, but the plaintiff responded, "I don't care anymore—

---

[11] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point.   See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

tase me." Id.   The officer subsequently discharged his taser.   Id.   The officer again asked the plaintiff to stand, warned he would tase him, and gave the plaintiff more time to comply, but ultimately deployed the taser a second time. Id. at 793.   After calling for backup, the officer returned to the plaintiff and ordered him to stand, gave him yet another warning, attempted to lift him once more, and when he still did not comply the officer discharged the taser a third time.   Id.   In its analysis, the Eleventh Circuit noted that although the traffic citation was minor, the government has a significant interest in enforcing the law on its own terms and in "arrests being completed efficiently and without waste of limited resources: police time and energy that may be needed elsewhere at any moment."   Id. at 794.   The court found that the deputy gave the plaintiff "ample warning and opportunity to cease resisting before the deputy resorted gradually to more forceful measures" and that his "use of force was not unconstitutionally excessive."   Id. at 796.   As noted above, unpublished opinions are not binding authority, but the Court nevertheless finds the court's analysis in Buckley informative.   Like Buckley, Tews did not try to escape arrest altogether, but she nonetheless refused to be arrested on the government's terms.   See Depo. Transcript 42–44.   Terrell was entitled to use force to overcome this resistance and ensure that Tews was properly handcuffed.

Accordingly, all three Graham factors—the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is attempting to resist arrest or evade capture by flight—weigh in Terrell's favor.   The Court does not end its inquiry there, however.   The Eleventh Circuit also instructs district courts to consider three other factors: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted."  Lee, 284 F.3d at 1197–98.   The Court refers to these as "the Lee factors."

The first Lee factor—the need for the application of force—is answered by the Graham factors themselves.   Tews' dangling handcuff created a need to restrain her.   Her refusal to follow commands, coupled with her escalating behavior and suicidal statements, suggested that Terrell needed to act quickly before the situation spiraled out of control.   See Horn, 720 F. App'x at 565 (holding that an officer was justified in using force to subdue an arrestee, even where that arrestee "was not disobeying a lawful command," because a reasonable officer could have perceived resistance and the threat of further disruption).

The second Lee factor—the relationship between the need and the amount of force used—likewise weighs in favor of Terrell.   Faced with a rapidly escalating situation (and an arrestee that he reasonably believed to be intoxicated, increasingly agitated, and beginning to express suicidal ideation),

Terrell reasonably believed that he needed to restrain Tews quickly.   He ruled out the use of a taser because of his proximity to (and contact with) Tews, and ultimately resorted to an arm-bar takedown.   Terrell Declaration at 7.   Once Tews was on the ground, Terrell reapplied the handcuffs and used no additional force.   <u>See</u> Depo. Transcript 70; Terrell Declaration 7.   Under the circumstances, a reasonable officer in Terrell's position could have believed that this was a proportionate response. <u>See</u> <u>Horn</u>, 720 F. App'x at 565 (concluding that a concertgoer's act of pulling away, combined with her volatile behavior and aggressive statements, justified the use of an arm-bar takedown).

In her Response, Tews argues that Terrell could have avoided the situation by "call[ing] a female officer to the scene to assist him," and that Terrell "could have been more patient" in re-cuffing her.   Response at 4. While Tews makes these arguments, she points to no evidence in support, and also fails to suggest how either contention raises a genuine issue of fact as to the reasonableness of Terrell's use of force.   Moreover, the Eleventh Circuit has noted that a "single officer . . . confronting a non-compliant arrestee . . . need not—as a matter of federal constitutional law—wait idly for backup to arrive to complete an otherwise lawful arrest that the officer has started."   <u>Buckley</u>, 292 F. App'x at 795.   Indeed, as the court explained:

> We do not sit in judgment to determine whether an officer made the best or a good or even a bad decision in the manner of carrying out an arrest. The Court's task

> is only to determine whether an officer's conduct falls
> within the outside borders of what is reasonable in the
> constitutional sense.

Id. at 791; see also Horn, 720 F. App'x at 564 (noting that even if an arm-bar takedown "was unnecessary, it was not unlawful" under the circumstances). Here, Tews' arguments are unavailing regardless of whether the alternatives she identifies were viable because the undisputed facts show that Terrell's decision to use the arm-bar takedown was reasonable.

The third Lee factor—the extent of the injury inflicted—likely weighs in favor of Tews.  Her injuries include missing and fractured teeth, lacerations and contusions to her lip and head, a concussion, nerve damage, and aggravation of her existing shoulder injury.  See Depo. Transcript 53–58, 92. These injuries, while not trivial, also are not especially severe.  But regardless of how serious one considers Tews' injuries to be, they were "the unfortunate result of" Terrell's "reasonable use of force" in a potentially dangerous situation. Horn, 720 F. App'x at 565.

In consideration of the record, construing the facts and drawing all reasonable inferences in Tews' favor, Haves, 52 F.3d at 921, Tews cannot show that Terrell's use of force against her was objectively unreasonable.  Given Tews' suicidal statements, her refusal to follow commands, and her apparent ability to harm herself or Terrell with the loose handcuff if left unrestrained, Terrell reasonably believed force was necessary to re-apply the handcuffs.

This was all the more reasonable because Terrell was the only officer at the scene.   Accordingly, Terrell's use of the arm-bar takedown did not violate Tews' Fourth Amendment rights.   The Court thus determines that Tews has failed to show a genuine issue of fact for trial on her claim against Terrell, and Terrell is therefore entitled to summary judgment.

## B. Clearly Established Law

Even if the Court found that Terrell's arm-bar takedown was unconstitutionally excessive, Tews fails to point to authority supporting a conclusion that Terrell violated a clearly established constitutional right.   See Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004), abrogated on other grounds by Williams v. Aguirre, 965 F.3d 1147 (11th Cir. 2020).   As the Supreme Court has explained:

> [f]or a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

Hope v. Pelzer, 536 U.S. 730, 739 (2002) (citation omitted) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).   For purposes of this analysis, the critical question is whether the state of the law gave the government actor "fair warning" that his alleged treatment of the plaintiff was unconstitutional. Vinyard, 311 F.3d at 1350 (quoting Hope, 536 U.S. at 741); see also Marsh, 268

F.3d at 1031 ("[F]air and clear notice to government officials is the cornerstone of qualified immunity."). The Eleventh Circuit recognizes three sources of law that would provide a government official adequate notice of statutory or constitutional rights: "specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." Harper v. Lawrence County, Ala., 592 F.3d 1227, 1233 (11th Cir. 2010) (quoting Goebert v. Lee County, 510 F.3d 1312, 1330 (11th Cir. 2007)). Thus, where the words of the federal statute or federal constitutional provision are specific enough "to establish clearly the law applicable to particular conduct and circumstances," then the plaintiff can overcome the qualified immunity privilege, even in the absence of case law. Vinyard, 311 F.3d at 1350. In this type of "obvious clarity" case, "the words of the federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." Id.

Alternatively, where the conduct alleged is not so egregious as to violate a statutory or constitutional right on its face, courts look to case law to determine whether the law is "clearly established." Id. at 1351. If the case law contains "some broad statements of principle" which are "not tied to particularized facts," then it may be sufficient to clearly establish the law applicable in the future to different facts. Id. However, to provide officials

with sufficient warning, the case law must establish a principle with such "obvious clarity" that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Id. Last, in the absence of broad statements of principle, precedent can clearly establish the applicable law where "the circumstances facing a government official are not fairly distinguishable, that is, are materially similar," to the particularized facts of prior case law. Id. at 1352. Such precedent must be found in decisions from the Supreme Court, the controlling circuit court of appeals, or the pertinent state supreme court. Id. at 1351. Although such a case "on all fours" with materially identical facts is not required to establish "fair warning" to government officials, see Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004) (discussing the impact of Hope on Eleventh Circuit precedent), "existing precedent must have placed the statutory or constitutional question beyond debate," see Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting Malley, 475 U.S. at 341)).

In her Response, Tews cites to Johnson v. City of Miami Beach, 18 F.4th 1267 (11th Cir. 2021). See Response at 4. Johnson involved an arrestee who was uncooperative while police transported him to jail. 18 F.4th at 1270. The arrestee consistently delayed in obeying commands, and, at the police station, confronted an officer by saying "I ain't scared of you by a long shot, buddy." Id. Six officers escorted the arrestee, who was unhandcuffed, to a holding cell. Id.

Arriving at the cell, the arrestee stated, "I'm not going to go in there."   Id.   An officer grabbed the arrestee's shoulder and pushed him into the cell.   Id.   As the arrestee stood motionless inside the cell and an officer reached to close the cell door, a second officer took "two or three steps forward, came into the cell, and forcibly struck [the arrestee] in the face with his elbow," lacerating his mouth.   Id. at 1271.   The Eleventh Circuit held that a jury could find the elbow strike excessive because the arrestee "was fully secured . . . [and was] not moving, resisting, or otherwise posing a threat," and because officers had no justification to use force at the time the blow landed.   Id. at 1273.   Turning to whether this excessive force violated clearly established law, the Eleventh Circuit applied the principle that an officer may not "use[] gratuitous force against an arrestee who is fully secured, not resisting arrest, and not posing a safety threat to the officer."   Id. at 1274.

Tews' reliance on Johnson is simply unpersuasive.   Unlike the arrestee in Johnson, Tews was not fully secured.   While the Johnson arrestee was not handcuffed, he was being escorted by six officers and was "well inside the cell and standing still."   Id. at 1271.   One of the six arresting officers also stated in a deposition that he could have "simply closed" the cell door without any use of force.   Id. at 1271 & n.1.   In contrast, it is undisputed that Terrell was alone, and that he executed the arm-bar takedown when Tews was outside the patrol car, "continu[ing] to pull away her free arm," and only partially handcuffed.

Terrell Declaration 6.   Indeed, Tews does not argue that she did not resist, only that she did not do so in a "way which justified" the force used, and that she was not "intentionally uncooperative."   Response 3.   Because Tews was not secured, and was moving, resisting, and reasonably appeared to be a threat to herself or Terrell, Tews' reliance on <u>Johnson</u> is unavailing.   Accordingly, even if Tews could show the violation of a right, she would not be able to show that it was clearly established.

## V.   Conclusion

For the foregoing reasons, Tews cannot show a genuine issue of material fact for trial as to her remaining claim of excessive force.   Accordingly, Terrell's Motion for Summary Judgment is due to be granted.

Accordingly, it is

**ORDERED:**

1.   Defendant T. L. Terrell's Motion for Summary Judgment and Accompanying Memorandum of Law (Doc. 26) is **GRANTED**.

2.   The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant.

3.    The Clerk of the Court is further directed to terminate any remaining motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 6th day of December, 2022.

MARCIA MORALES HOWARD

United States District Judge

lc31

Copies to:

Counsel of Record